FILED
2013 Mar-11  PM 02:34
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| JEFF BENTON HOMES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil Action No. 5:11-cv-1379-CLS |
| | ) | |
| ALABAMA HERITAGE HOMES, | ) | |
| INC., and STONERIDGE | ) | |
| HOMES, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Jeff Benton Homes, Inc. ("Jeff Benton") filed this case on April 22, 2011, asserting claims of copyright infringement under the federal Copyright Act of 1976, 17 U.S.C. § 101 *et seq.* (the "Copyright Act"), against defendants Alabama Heritage Homes, Inc. ("Alabama Heritage"), and Stoneridge Homes, Inc. ("Stoneridge"). Plaintiff's claims arise out of defendants' alleged copying of two house plan designs copyrighted by plaintiff.[1] The case currently is before the court on defendants' joint motion for summary judgment,[2] and plaintiff's motion to exclude the testimony of defendants' expert witnesses, Jeremy C. Erdreich and Denise T. Dauphin.[3] Upon consideration of those motions, the parties' briefs, and the evidence,

---

[1] *See* doc. no. 1 (Complaint).

[2] Doc. no. 22.

[3] Doc. no. 26.

the court concludes that the motion to exclude expert testimony should be granted in part and denied in part.  The motion for summary judgment will be granted.

## I.  MOTION TO EXCLUDE

This opinion will address only those portions of the proposed expert testimony relied upon by defendants in support of their motion for summary judgment.  For example, defendants do not rely upon the testimony of Denise T. Dauphin; instead, her testimony goes solely to the question of damages and will be ignored here. Similarly, the testimony of Jeremy C. Erdreich about the subject of apportionment of value is not relevant to any issue raised by the motion for summary judgment, and is relevant only to the question of damages.  Accordingly, this opinion will address only that portion of Mr. Erdreich's testimony that relates to the subjects of functionality of design elements, lack of design variation, and substantial similarity.

### A.    The Requirements of Federal Rule of Evidence 702

Federal Rule of Evidence 702, pertaining to opinion testimony that is offered by so-called "expert witnesses," was most recently revised by amendments that became effective on December 1, 2011.  The present version of the rule reads as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.[4]  That rule compels district courts to perform "gatekeeping"

functions when determining the admissibility of expert scientific and technical

evidence.  *See, e.g., United States v. Abreu*, 406 F.3d 1304, 1306 (11th Cir. 2005)

---

[4] According to the Advisory Committee Notes accompanying the present version of Rule 702, the rule was amended "as part of the restyling of the Evidence Rules to make them more easily understood and to make style and terminology consistent throughout the rules.  These changes are intended to be stylistic only.  There is no intent to change any result in any ruling on evidence admissibility."

The former version of Rule 702, as amended in 2000, in response to the Supreme Court's decisions in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993); *General Electric Co. v. Joiner*, 522 U.S. 136 (1997); and *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999), read as follows:

**Rule 702.  Testimony by Experts**

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702 (version in effect prior to Dec. 1, 2011).

(quoting *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004)).  "This function inherently requires the trial court to conduct an exacting analysis of the foundations of expert opinions to ensure they meet the standards for admissibility under Rule 702."  *Id.* (internal quotation omitted).

> [T]he objective of that requirement is to ensure the reliability and relevancy of expert testimony.  It is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.

*Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999) (alteration supplied).

"The inquiry . . . is a flexible one" because, in any given case, "[m]any factors will bear on the inquiry, and . . . [there is no] definitive checklist or test."  *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 593-94 (1993) (alterations supplied).  Factors that may be relevant include:

> (1) whether the theory or technique can be (and has been) tested, (2) whether the theory or technique has been subjected to peer review and publication, (3) in the case of a particular . . . technique, the known or potential rate of error, and (4) whether the theory or technique is generally accepted by the relevant . . . community.

*Hendrix ex rel. G.P. v. Evenflo Co., Inc.*, 609 F.3d 1183, 1194 (11th Cir. 2010) (internal quotation marks and alterations omitted).[5]

---

[5] Additional factors that may be taken into account by a district court include:

> (1) Whether the expert is proposing to testify about matters growing naturally and directly out of research he has conducted independent of the litigation, or

**B**.  **Erdreich's Background and Qualifications**

Jeremy C. Erdreich is a registered architect practicing in Birmingham, Alabama.  He received a Bachelor of Arts degree in Architecture from Yale College in May of 1990, and a Master of Arts degree in Architecture from Harvard University's Graduate School of Design in March of 1994.  He has operated his own architecture firm, "Erdreich Architecture," since 1998.   The firm provides comprehensive architectural services, including historical renovations, design of commercial spaces, and design of residential properties varying from approximately 2,000 to 12,000 square feet in size.[6]

**C.**  **Erdreich's Expert Report**

Erdreich submitted an expert report on April 6, 2012, comparing plaintiff's "2715" house plan design to defendants' "Dorothy" design,[7] and reached four primary

---

whether he has developed his opinion expressly for purposes of testifying;

     (2) Whether the expert has unjustifiably extrapolated from an accepted to an unfounded conclusion;

     (3) Whether the expert is being as careful as he would be in his regular professional work outside his paid litigation consulting;

     (4) Whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give.

Fed. R. Evid. 702 advisory committee's note to 2000 amends. (internal citations omitted).

[6] Doc. no. 26 (plaintiff's motion to exclude), Exhibit 6 (April 6, 2012 Expert Witness Report of Jeremy C. Erdreich), at ECF 7-8.

    [7] Erdreich's expert report did not explicitly discuss the "2820" plan, the other house plan

conclusions: (1)(a) "The Design Elements Contained in These House Plans are Mostly Functional"; (1)(b) "House Plans in this Market Segment have Fewer Design Variations"; (2) "These Plans are Not Substantially Similar"; and (3) "The Apportionment of Value is Substantially Diminished by Several Factors."[8]   He indicated that his conclusions were based upon a review of the two house plans, a review of nine other production house plans from other companies, and his 18 years of professional experience in residential architecture.[9]

## 1.   Functionality of design elements

Erdreich explained that the design of a house plan involves two primary principles: *i.e.,* "functionality" and "creativity."

> *Functionality* refers to those design elements that are determined by standards and expectations beyond the individual notions and preferences of the designer. Functionality is a product of external forces including the marketplace and industry standards. On the other hand, *creativity* refers to the remaining design elements that are not subject to these external forces, and are thus subjective to the preferences of the designer. However, it is important to realize that "creative" design elements taken in isolation or individually may or may not be original.

---

plaintiff alleges that defendants copied. However, it is undisputed that the 2820 plan is a "reverse image" of the 2715 plan, with other minor modifications. *See* doc. no. 22 (defendants' joint motion for summary judgment), at 6, Proposed Undisputed Fact No. 5 ("The 2820 plan is a reverse-image of the 2715 layout, with the addition of a 'powder bathroom' and other modifications to certain features of the plan."); doc. no. 49 (plaintiff's brief in response to defendants' motion for summary judgment), at 4 (Response to Movant's Statement of Undisputed Facts) (omitting any response to defendants' Proposed Undisputed Fact No. 5).

[8] Erdreich April 6, 2012 Report, at ECF 2-5.

[9] *Id.* at ECF 5.

Especially at relatively lower market price points, these elements may still be repetitive, commonplace, and indistinguishable from one plan to another.[10]

Erdreich characterized the "2715" and "Dorothy" house plans as "production houses," meaning that they: are uniform in size (approximately 3,000 square feet); are planned for a relatively narrow subdivision lot; and are sold at uniform prices (approximately $300,000 in the Huntsville, Alabama area). He noted that, like other "production houses" constructed and sold nationwide, the "2715" and "Dorothy" home plans share many design elements based solely on functionality, including:

1.   Small formal Living and Dining rooms flanking a small front Foyer;

2.   A larger, open, informal Family and Kitchen area facing the rear;

3.   Provision of all, or almost all, Living areas on main level;

4.   Separation of Master Suite from secondary bedrooms;

5.   Minimum 2-car Garage;

6.   Four total Bedrooms and three total Bathrooms;

7.   Laundry or Mud Room convenient to Garage;

8.   Pre-fabricated fireplace;

9.   Either one larger or two somewhat smaller Master walk-in closets;

---

[10] *Id.* at ECF 2.

10. Double vanity, garden tub, separate shower, separate water closet in Master Bath; [and, an]

11. All-brick exterior.[11]

The 2715 and Dorothy home plans, like other "production homes" of the same market segment and size, also share certain functional elements driven by industry standards, including:

1. Absence of basement or crawl space;

2. Absence of finished attic space;

3. Relatively square plan to reduce material and labor costs;

4. Relatively few French doors, in favor of more economical fixed or sash windows;

5. Room dimensions that require standard, economical lumber spans and stud heights;

6. Simple, centralized roof geometry; [and]

7. Consistent, standard window sizes and head heights.[12]

Finally, Mr. Erdreich stated that both homes share certain non-functional, or "creative," elements, including:

1. Bathroom layouts (as long as the functional elements above are included);

---

[11] *Id.* (alteration supplied).

[12] *Id.* at ECF 3 (alteration supplied).

2.      Closet configurations and locations;

3.      Kitchen arrangements and orientations;

4.      Laundry Room arrangements;

5.      Front Door design;

6.      Window configurations, placement and grid layouts;

7.      Window shutters; [and]

8.      Minor decorative details such as brick coursing and headers, small stone accents, etc.[13]

Based upon all of the foregoing considerations, Mr. Erdreich concluded that, in the 2715 and Dorothy houses, as well as in other market "production houses," "the vast majority of elements of functionality are similar.  The remaining non-functional elements show substantial — although not necessarily unique — differences."[14]

### 2.      Lack of design variations

Mr. Erdreich also concluded that, when considering the group of "production houses" geared toward the same market segment as the 2715 and Dorothy houses, "there are fewer variations within the designs of floor plans, whether within elements of functionality or non-functionality."[15]  As he explains, "[t]here are a limited variety

---

[13] *Id.* (alteration supplied).

[14] Erdreich April 6, 2012 Report, at ECF 3.

[15] *Id.* at ECF 4.

of ways that a roughly 3,000 [square-foot] square plan can be divided once functional demands of market and economy are met."[16]  Therefore, "even modest dissimilarities in house plans at this market segment become important."[17]

### 3.    Substantial similarity

Mr. Erdreich next concluded that the 2715 and Dorothy house plans "are not substantially similar because, once the elements of functionality are removed, the non-functional elements that remain exhibit many differences."[18]  He notes that, in plans like the 2715 and Dorothy houses, other elements of creativity — such as paint colors, countertop surfaces, molding profiles, cabinet door styles, hardware type and finish, and appliance selection — are the "real choice" for buyers who are using a particular floor plan, because the functional elements are fixed by nature.[19]  Erdreich also states that "many of the above-referenced non-functional elements — while they may enhance differences between the final house products — are often buyer-generated decisions rather than decisions made by designers or contractors."[20]

## C.    Erdreich's Deposition Testimony

Erdreich testified during deposition that approximately 90 to 95 percent of his

---

[16] *Id.* (alterations supplied).

[17] *Id.*

[18] *Id.* at ECF 4.

[19] *Id.*

[20] Erdreich April 6, 2012 Report, at ECF 4.

practice consists of residential architecture, with commercial work making up the remainder.[21]  He has never performed any architectural work in the Madison County, Alabama area,[22] but he has designed house plans for "production builders" in the Birmingham-Jefferson County area.[23]

When questioned about the other house plans he reviewed in order to form his opinions, Erdreich testified that he selected those plans from house plan websites by using search criteria that would yield plans with characteristics similar to the 2715 and Dorothy plans, including square footage, number of bedrooms, and one-story structure.[24]  Erdreich did not know the name of the persons who designed those house plans, when the plans were created, or whether any of the plans had been used in the construction of homes.[25]  He did not look at any other production house plans that were being used or built in Madison County, and he did not conduct a survey of the Huntsville-Madison County housing market to determine the relative weights placed by home buyers on functional and non-functional elements.[26]  Instead, he identified

---

[21] Doc. no. 23 (defendants' evidentiary submission), Exhibit 13 (Deposition of Jeremy Erdreich), at 27-28.  Plaintiff only attached certain excerpts from Erdreich's deposition to the motion to exclude, so the court will refer to the entire deposition, which was provided as part of defendants' summary judgment evidentiary submission.

[22] *Id.* at 57.

[23] *Id.* at 57-72.

[24] *Id.* at 84-89.

[25] *Id.* at 89-93.

[26] *Id.* at 115-18.

the various functional and non-functional (or "creative") elements listed in his report based upon his own experience, and not by considering reference materials or other external forces.[27]  Similarly, the decision to disregard common functional elements before comparing the 2715 and Dorothy house plans was part of Erdreich's own methodology; he had no knowledge of whether it was standard in the context of copyright infringement lawsuits to remove functional elements before comparing two house plans.[28]

**D.**    **Analysis**

Plaintiff does not appear to challenge Mr. Erdreich's general qualification to testify as an "expert witness" in this case.[29]  Instead, plaintiff contends that Mr. Erdreich's testimony should be stricken because it is not based on sufficient facts or data, because he failed to apply reliable methodology in a reliable fashion, and because the testimony would not assist the trier of fact.

Plaintiff first asserts that Mr. Erdreich's conclusions are not based upon sufficient facts or data because he relied solely upon his own opinions and experience, not any outside sources; because he is not familiar with the Huntsville-

---

[27] Erdreich Deposition, at 94-97, 104-05, 111-12.

[28] *Id.* at 119-21.

[29] *See* doc. no. 28 (plaintiff's brief in support of motion to exclude), at 11 (making arguments on the assumption that both Dauphin and Erdreich "could be regarded as sufficiently qualified experts").

Madison County real estate market, or house plans commonly used in that market; and because he made comparisons to only nine other house plans that he selected from Internet sites, without knowing the identities of the designers, creation dates, copyright status, or usage histories of any of the plans.[30]   Plaintiff also attacks Erdreich's methodology, and particularly his separation of functional from non-functional elements, as being of Erdreich's own creation, and not based upon any outside references or other factors.   Additionally, plaintiff asserts that Erdreich applies an incorrect standard for evaluating copyright infringement claims.[31]  Finally, plaintiff contends that Erdreich's testimony will not assist the trier of fact, because he offers nothing more than "lay opinions."[32]

The court is not persuaded by plaintiff's arguments.  The fact that Mr. Erdreich

---

[30] *Id.* at 13-14.

[31] *Id.* at 16-18.

[32] *Id.* at 21-23.  "Lay opinion" testimony is governed by Federal Rule of Evidence 701.  As last amended on December 1, 2011, the Rule reads as follows:

> If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:
>
> (a) rationally based on the witness's perception;
>
> (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and
>
> (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Fed. R. Evid. 701 (2012).

based his testimony on his own experience, and not any outside source, does not necessarily disqualify him as an expert. *See* Fed. R. Evid. 702, advisory committee's notes to 2000 amends. ("Nothing in this amendment is intended to suggest that experience alone . . . may not provide a sufficient foundation for expert testimony. . . . In certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony."). Instead, it must be established, by considerations other than the expert's experience, that his methodology is reliable. *Cf. United States v. Frazier*, 387 F.3d 1244, 1260-61 (11th Cir. 2004) ("Of course, the unremarkable observation that an expert may be qualified by experience does not mean that experience, standing alone, is a sufficient foundation rendering reliable *any* conceivable opinion the expert may express.") (emphasis in original).

Additionally, the fact that Mr. Erdreich does not work in the Huntsville-Madison County real estate market, and the additional fact that he did not conduct any analysis of house plans and buyer preferences within that narrow market, does not render his testimony inherently unreliable. Mr. Erdreich clarified that, even though he had never designed any homes in the Huntsville-Madison County area, he had "general knowledge of production building and other sectors of construction and architecture across the state, the region, and the country . . . ."[33] He further testified

---

[33] Erdreich Deposition, at 99.

that the functional and non-functional elements identified in his report were common to all production home markets, not just the local Huntsville-Madison County market.[34]  He also stated that he was familiar with home building industry standards throughout the State of Alabama, and the Huntsville-Madison County area was "not any great exception to those building standards."[35]  Plaintiff has not given the court any reason to doubt Mr. Erdreich's general familiarity with state-wide standards and practices, or to conclude that the Huntsville-Madison County area should be treated differently from other parts of the State.

Moreover, the court simply does not understand why Mr. Erdreich's comparison of the 2715 and Dorothy plans to nine other plans he found on Internet sites should be considered improper, given that Mr. Erdreich's method for comparing the plans to each other already has been deemed sufficiently reliable.  Nor is there any reason why Mr. Erdreich should be faulted for not knowing the names of the designers, creation dates, copyright status, or building status of any of the plans he reviewed.

The court also does not agree that Mr. Erdreich's testimony should be excluded

---

[34] *Id.* at 103-04.  *See also id.* at 105 (characterizing the listed functional and non-functional elements as "being common across the production housing industry in terms of being functionality elements that are common").

[35] *Id.* at 107.  *See also id.* at 109 ("I'm generally familiar with elements across the state of Alabama, and through my own personal experience and knowledge, I would not assume that Huntsville-Madison would be any great difference from that body of knowledge . . . .").

because of the "standard" he used.  Plaintiff asserts that "Erdreich's reliance on

creative elements alone is in error and in conflict with applicable law," because

plaintiff's "selection, coordination, or arrangement of individual standard features

must be considered when determining substantial similarity."[36]  The court recognizes

that the compilation of design features in an architectural work could be afforded

copyright protection, even if the individual design features themselves could not be.

Even so, that does not mean, as plaintiff suggests, that a comparison of individual

design features is completely irrelevant.  As the Eleventh Circuit stated in *Oravec v.*

*Sunny Isles Luxury Ventures, L.C.,* 527 F.3d 1218 (11th Cir. 2008):

> The Copyright Act's definition of "architectural work" excludes
> "individual standard features" from the protectible elements of the
> design. 17 U.S.C. § 101.  According to legislative history, such features
> include "common windows, doors, and other staple building
> components." H.R. Rep. No. 101-735 (1990), *as reprinted in* 1990
> U.S.C.C.A.N. 6935, 6949; *see also T-Peg, Inc. v. Vermont Timber*
> *Works, Inc.*, 459 F.3d 97, 110 (1st Cir. 2006) (citing legislative history).
> At the same time, however, the statute includes within the definition of
> "architectural work" "the arrangement and composition of spaces and
> elements in the design." 17 U.S.C. § 101.  This definition reflects
> Congress's awareness that "creativity in architecture frequently takes the
> form of a selection, coordination, or arrangement of unprotectible
> elements into an original, protectible whole." H.R. Rep. No. 101-735,
> *as reprinted in* 1990 U.S.C.C.A.N. at 6949.  Thus, while individual
> standard features and architectural elements classifiable as ideas are not
> themselves copyrightable, an architect's original combination or
> arrangement of such features may be. *See Corwin*[ *v. Walt Disney Co.*],
> 475 F.3d [1239,] 1251 [(11th Cir. 2007)] ("[A] work may be protected

---

[36] Doc. no. 28, at 18.

by copyright law when its otherwise unprotectable elements are arranged in a unique way."); *T-Peg*, 459 F.3d at 110 (noting that combination of individual standard features in architectural work may be copyrightable); *Sturdza v. United Arab Emirates*, 281 F.3d 1287, 1296 (D.C. Cir. 2002) (observing that artist's selection, coordination, and arrangement of color may be protectible, even though color itself is not).

*Oravec,* 57 F.3d at 1225 (alteration and emphasis in original).   Thus, *both* the individual design elements *and* the unique compilation of those elements are relevant to the copyright infringement analysis, and Mr. Erdreich's testimony about individual design elements is proper.   Plaintiff still was able to address the issue of whether its design *compilations* are similar to defendants' through its summary judgment briefs, and if the case had survived summary judgment, it would have been able to explore that issue through cross-examination of Mr. Erdreich at trial.

Finally, the court does not agree that Mr. Erdreich is merely offering a lay opinion.   The Eleventh Circuit held in *Frazier* that "expert testimony is admissible if it concerns matters that are beyond the understanding of the average lay person." *Frazier,* 387 F.3d at 1262 (citing *United States v. Rouco*, 765 F.2d 983, 995 (11th Cir. 1985)).   However, "expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments." *Frazier,* 387 F.3d at 1262-63 (citing 4 *Weinstein's Federal Evidence* §

702.03(2)(a)).[37]  To support its argument that Mr. Erdreich's testimony would not assist the trier of fact, plaintiff points to Mr. Erdreich's deposition testimony that, when he is creating a new custom home or renovation plan for a customer, the customer typically reviews the plan and makes several rounds of revisions before the plan is finalized.[38]  The court finds that argument utterly unpersuasive.  Of course, a home owner would review his architect's proposed plan before finalizing it and building the house; and, of course, the owner might (and probably would) suggest changes if she or he had any in mind.  But, that does not mean that the same home owner possesses the ability to compare two sets of house plans and identify both common factors and differences to the same extent as a licensed architect such as Erdreich.  His expertise clearly would assist the trier of fact in identifying common elements and differences between plaintiff's 2715 plan and defendants' Dorothy plan.

These conclusions are reinforced by the two district court decisions cited by defendants.  Even though those decisions are unpublished and non-binding, the court finds them to be persuasive on the issue of whether an architect should be allowed to serve as an expert witness for the purpose of comparing two house plans in a copyright infringement analysis.

---

[37] The *Frazier* opinion did not specify which edition of *Weinstein's Federal Evidence* was being cited.

[38] *See* Erdreich Deposition, at 42-49.

In *The Harvester, Inc. v. Rule Joy Trammell Rubio, LLC,* No. 3:09-CV-358, 2010 WL 2653373 (E.D. Va. July 2, 2010), the plaintiff offered the expert testimony of James Finch, an architect, to prove that the defendant had copied its architectural plans. *Id.* at *2. The defendant challenged Finch's testimony as unreliable under *Daubert* and its progeny for the following reasons:

> Finch testified that he reached his opinion that Rule Joy copied protected elements from Commonwealth's drawings simply by observing the subject documents generally and then in more detail. He acknowledged that he used no other methodology or testing to arrive at his opinions; did not use any computer analysis to evaluate the drawings; has never employed the method used to determine whether drawings had been copied; has no special training or experience with determining whether drawings have been copied; is not aware of any literature addressing the issue of evaluating whether drawings were copied; and does not contend that there was wholesale copying of the drawings but, rather, that certain elements were copied. Finch was unable to provide a specific percentage of similarities that warranted the opinion that the drawings were copied and admitted that "he [is] an expert on copying but not an expert in the process of copying." While Finch suggested that his method was "a fairly standard way" of reviewing drawings, he was not aware of any other architect using the method to determine whether drawings were actually copied. Further, he did not know whether his method had ever been peer reviewed by other architects and was not aware of any standards which control the method he used; however, he was of the opinion that his method enjoyed general acceptance within the community of architects.

*Id.* at *2 (alteration in original). The district court rejected the defendant's challenge, likening Finch's testimony to that of a law enforcement officer on the meaning of drug code words, or a forensic photographic investigator on child pornography —

other fields in which someone can become an expert through experience alone.  *Id.*
The court held that "a licensed architect with extensive experience reviewing
architectural drawings is qualified to give expert testimony as to whether two
different sets of architectural drawings contain meaningful architectural similarities
. . . ."  *Id.*   The court also remarked that Finch's thirty years of architectural
experience provided him with "the basis for knowledge, skill, or experience
exceeding that of the average juror."  *Id.* at *3 (citing *United States v. Perkins*, 470
F.3d 150, 155 (4th Cir. 2006)).

Similarly, in *Home Design Services, Inc. v. Trumble,* No. 09-CV-00964, 2011
WL 1638910 (D. Colo. April 29, 2011), both parties offered expert testimony from
an architect in a case involving claims of copying of residential architectural designs.
*Id.* at *2.  The most relevant analysis from the opinion concerned the defendant's
rebuttal expert, Kevin Alter.  The plaintiff moved to exclude an exhibit to Alter's
expert report that included a list of the similarities and differences between the two
house plans in question, asserting, among other things, that the list would not assist
the trier of fact because the jury was capable of making the comparison by
themselves.  *Id.* at *5.  The district court held:

> While I agree that the jury will ultimately be asked to determine whether
> the two works are substantially similar, I do not agree that Mr. Alter's
> testimony regarding architectural similarities and differences fails to

provide any assistance to the jury in deciphering the plans at issue.  It is clear that expert testimony is admissible to show probative similarity between two works.  And in cases involving architectural plans, the need for expert testimony may be greater, given the somewhat complex subject matter.  *See e.g. T-Peg, Inc. v. Vermont Timber Works, Inc.*, 459 F.3d 97, 116 (1st Cir. 2006) ("Moreover, the need for expert testimony may be greater in cases involving complex subject matters where an ordinary observer may find it difficult to properly evaluate the similarity of two works without the aid of expert testimony.").  Mr. Alter's testimony regarding similarities and differences is reliable because it is based upon his extensive professional experience, as applied to the particular works at issue in his case.  *See United States v. Hankey*, 203 F.3d 1160, 1169 (9th Cir. 2000) (stating that an expert's reliability may depend heavily on the "knowledge and experience of the expert, rather than the methodology or theory behind it"); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 156, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999) (stating that an expert may draw a conclusion from a set of observations based on extensive and specialized experience).  As a licensed architect, Mr. Alter is qualified to give expert testimony as to whether the two works have meaningful architectural similarities.

*Trumble,* 2011 WL 1638910, at \*5.  Even with those observations in mind, the district court cautioned that Alter should not be permitted to "provide legal opinions on the ultimate issues in this case."  *Id.*  Thus, as long as Alter did not "offer his ultimate conclusion that taken a whole, the two works are substantially similar," he could "assist the jury in parsing out the different design elements and components of the architectural works at issue."  *Id.*

Like the expert witnesses in the *Harvester* and *Trammel* cases, Jeremy C. Erdreich is qualified to assess the similarities and differences between plaintiff's two

plans and defendants' Dorothy plan. Erdreich's testimony regarding those similarities and differences is sufficiently reliable because it is based on his many years of professional architectural experience.  As such, his testimony would assist jurors in reaching a determination of whether the works are substantially similar for purposes of copyright infringement.  Accordingly, Mr. Erdreich will not be disqualified from testifying as an expert witness for the purpose of evaluating the similarities and differences between plaintiff's two plans and defendants' Dorothy plan.

Even so, the court is persuaded by the reasoning of the district court in *Trumble* that Erdreich should not be permitted to testify as to the ultimate issue of "substantial similarity."  Therefore, any references in Mr. Erdreich's report to the subject of "substantial similarity" will be stricken, and the court will not consider any such testimony when ruling on the motion for summary judgment.  Instead, the court will form its own conclusions about substantial similarity based on Erdreich's other opinions, and the other evidence of record.

## II. MOTION FOR SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56 provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In other words, summary judgment is proper "after adequate time for discovery and

upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment." *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)).  Inferences in favor of the non-moving party are not unqualified, however.  "[A]n inference is not reasonable if it is only a guess or a possibility, for such an inference is not based on the evidence, but is pure conjecture and speculation." *Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1324 (11th Cir. 1983).  Moreover,

> [t]he mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is *material* to an issue affecting the outcome of the case.  The relevant rules of substantive law dictate the materiality of a disputed fact.  A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman*, 229 F.3d at 1023 (quoting *Haves*, 52 F.3d at 921) (emphasis supplied). *See also Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 251-52 (1986) (asking "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law").

# III. SUMMARY OF FACTS

## A.    The Parties

Plaintiff, Jeff Benton Homes, Inc. ("Jeff Benton"), has been in the business of residential construction in the Huntsville-Madison County, Alabama, area since 1987.[39]   Defendants, Alabama Heritage Homes, Inc. ("Alabama Heritage"), and Stoneridge Homes, Inc. ("Stoneridge"), also are homebuilders in the Huntsville-Madison County area.  Alabama Heritage was formed in 2002,[40] and Stoneridge in 2008.[41]  Alabama Heritage and Stoneridge are related entities, sharing office space, a corporate president, and some employees.[42]

Alabama Heritage's business model shifted in 2007.  Prior to that year, the company rarely constructed a home from a "production plan"; instead, most of its residential plans were unique, and customized according to the needs of the customer.[43]  The housing market changed in 2007, however, and Alabama Heritage began building homes from simpler, boxier, more efficient plans with fewer custom

---

[39] Defendants' evidentiary submission, Exhibit 4 (Deposition of Jeffrey Michael Benton), at 54-55.

[40] Plaintiff's evidentiary submission, Exhibit 1 (Rule 30(b)(6) Deposition of Alabama Heritage Homes, Inc.), at 15.

[41] Plaintiff's evidentiary submission, Exhibit 2 (Rule 30(b)(6) Deposition of Stoneridge Homes, Inc.), at 9.

[42] Stoneridge Deposition, at 9-12.

[43] Alabama Heritage Deposition, at 83-84.

designs, including the "Dorothy" plan that is the subject of this lawsuit.[44]  Prior to its

marketing shift, Alabama Heritage considered its biggest competitor to be Woodland

Homes.  After the shift, Alabama Heritage began to compete more with plaintiff, and

another company called Breland Homes.[45]

Jeff Benton currently considers Alabama Heritage and Stoneridge to be its most

significant competitors in the local market.[46]  All three companies sell homes on

similar lot sizes and at a similar price point.[47]  Defendants have developed

communities within four miles of at least seven of plaintiff's residential

developments, and they occasionally have even constructed homes within the same

community as plaintiff.[48]

Alabama Heritage uses its sales staff to research the activities and strategies of

its competitors, including Jeff Benton.  Alabama Heritage salespeople review the

---

[44] *Id.* at 83-84, 94.

[45] *Id.* at 97-98.

[46] Benton Deposition, at 212.

[47] Defendants' evidentiary submission, Exhibit 15 (Deposition of Wendy Ann Lee), at 42-46. This fact, among others, was taken from the Additional Undisputed Facts and Additional Disputed Facts sections of plaintiff's brief in opposition to defendants' motion for summary judgment.  *See* doc. no. 49 (plaintiff's brief), at 7-12.  Defendants did not respond to plaintiff's proposed additional undisputed and disputed facts in their reply brief.  *See* doc. no. 55 (defendants' reply brief). Accordingly, pursuant to the Appendix to the Uniform Initial Order, all of plaintiff's proposed facts are deemed admitted for purposes of summary judgment.  *See* doc. no. 9 (Uniform Initial Order), at 16 ("*All additional material facts set forth in the statement required of the opposing parties will be deemed to be admitted for summary judgment purposes unless controverted by the statement of the movant.*") (emphasis in original).

[48] Lee Deposition, at 33-36; Alabama Heritage Deposition, at 42-44; Stoneridge Deposition, at 108-111.

competitor's product and amenities, and are supposed to, but do not always, generate reports for review by the company's president.[49]  Some of this information is gathered when the Alabama Heritage salespeople drive through the neighborhoods being developed by its competitors.[50]  Alabama Heritage also is aware of Jeff Benton's advertising efforts, sales numbers, and sales promotions,[51] and it has noticed Jeff Benton's submissions in the Parade of Homes, possibly including the home designs that are the subject of the instant lawsuit.[52]

## B.   Plaintiff's 2715 and 2820 House Plans

Plaintiff's best-selling house plans historically have been the 2715 plan and the 2820 plan.[53]  Both plan names refer to the total number of square feet encompassed by the plan.[54]  The two plans are identical, except that they are reverse images of each other, and the 2820 plan has an additional powder-room half-bath that is not present in the 2715.[55]  Both plans originally were drawn by a draftsperson named Julie Brakefield.  Brakefield has never received a W-2 tax form from Jeff Benton, and she never executed a work-for-hire agreement with the company.  Instead, she worked as

---

[49] Alabama Heritage Deposition, at 214-16.

[50] *Id.* at 224-25.

[51] *Id.* at 216-22.

[52] *Id.* at 219-20.

[53] Lee Deposition, at 163.

[54] Benton Deposition, at 94.

[55] Defendants' evidentiary submission, Exhibit 3 (Deposition of Julie Brakefield), at 202-03.

an independent contractor for Jeff Benton and other local home builders.[56]  Brakefield

hand-drew the 2715 plan in 1997 and sold it to Jeff Benton for $200, with an

unwritten agreement that Jeff Benton could build an unlimited number of homes from

the plan and not owe Brakefield any additional compensation.[57]   Over time,

Brakefield made a series of small changes to the 2715 plan that, ultimately, in

approximately 2001, resulted in the 2820 plan.  On May 18, 2006, Brakefield and Jeff

Benton executed an Assignment Agreement stating:

> This Assignment is entered into on May 18, 2006, between Jeff
> Benton Homes, Inc., an Alabama corporation ("**Assignee**"), and Julie
> Brakefield, a resident of Alabama ("**Assignor**").

> ### WITNESSETH:

> WHEREAS, ASSIGNEE has paid for the services of ASSIGNOR
> as an independent contractor to create certain residential home plans,
> architectural works, and architectural drawings for use by ASSIGNEE;
> and

> WHEREAS, in furtherance of said services, ASSIGNOR has
> made contributions to each of ASSIGNEE's listed Works on Exhibit 1
> (the "**Works**"), including but not limited to, adding new copyrightable
> subject matter to said Works, modifying said Works, advancing
> concepts into copyrightable subject matter in said works, and otherwise
> fixing said concepts into tangible mediums of expression resulting in
> said Works and adaptations of said Works; and

> WHEREAS, ASSIGNOR recognizes that it has always been the

---

[56] *Id.* at 47-48.

[57] *Id.* at 92-95.

intent of ASSIGNOR and ASSIGNEE that ASSIGNEE would exclusively own all rights, title and interest whatsoever in and to the Works and all future uses of the Works;

NOW, THEREFORE, in consideration of the foregoing, and the mutual premises herein contained, the parties hereto, intending legally to be bound, hereby agree as follows:

1.      In consideration of payments received by ASSIGNOR from ASSIGNEE, and for other good and valuable consideration which is hereby acknowledged and considered to be sufficient, ASSIGNOR hereby assigns to ASSIGNEE any and all rights to all works of authorship created by ASSIGNOR, including any and all copyright rights to all floor plans, house plans, architectural works, artwork, design, drafts, advertising, prints, negatives, and all other copyrightable subject matter which pertain to the Works.

2.      ASSIGNOR represents and warrants that all of her contributions to the Works were made by her acting on her own behalf, and not as an employee of any other person or entity, and that no other person or entity has any claim of ownership to, or copyright interest in, any of ASSIGNOR'S contributions to the Works.[58]

The exhibit to the Assignment Agreement lists a number of house plans, including the 2715 (which is referred to as the "original version of 2820 plan"), and five variations of the 2820.[59]

Jeff Benton converted all of Brakefield's hand drawings, including her drawings for the 2715 and 2820 plans, to an electronic format using computer-aided design and drafting ("CADD") software, because CADD drawings are much easier

---

[58] Defendants' evidentiary submission, at Exhibit 6 (Assignment Agreement) (all emphasis in original).

[59] *Id.* at Exhibit 1.

to work with and modify than hand drawings.[60]  Jeff Benton does not know which individual draftsman created the CADD drawings of the 2715 and 2820 plans, but all of the draftsmen employed by Jeff Benton during the time period when those plans were converted to CADD "drawings" were "1099 employees," or independent contractors, and none of them ever signed a work-for-hire agreement with Jeff Benton.[61]  Furthermore, none of the CADD artists ever executed an Assignment Agreement similar to the one executed by Julie Brakefield, assigning any of their rights to their contributions to the electronically redrawn 2715 and 2820 plans.[62] Brakefield's original hand drawings of the 2715 and 2820 plans have been lost.[63]

## C.    Plaintiff's Copyright Certificates

Jeff Benton received Certificates of Registration from the United States Copyright Office for the 2715 and 2820 plans on May 31, 2006.[64]  The copies of the 2715 and 2820 plans that were submitted to the Copyright Office in support of Jeff Benton's applications for those certificates were the CADD drawings that were created from Julie Brakefield's hand-drawn designs.[65]  Jeff Benton waited until 2006

---

[60] Brakefield Deposition, at 93-95; Benton Deposition, at 114-20.

[61] Benton Deposition, at 74, 87.

[62] *Id.* at 87.

[63] Brakefield Deposition, at 101-02.

[64] *See* defendants' evidentiary submission, Exhibits 1 and 2 (Certificates of Registration).

[65] Brakefield Deposition, at 139-41.

to apply for Certificates of Registration because the company only learned during that year that another competitor, Dennis Olive Homes, was using its house plans.[66]  Both before and after receiving the Certificates of Registration for the 2715 and 2820 plans, Jeff Benton repeatedly published copies of those plans without affixing any notice of copyright.[67]

### 4.   Defendants' Dorothy Plan

Defendants build homes from a plan they call the "Dorothy."   Alabama Heritage purchased the Dorothy plan from an architectural draftsman named Lavor Haynie in May of 2007.[68]   At that point in time, Mr. Haynie had worked as a draftsman in Madison County, Alabama, for approximately four years.[69]  He worked as an independent contractor for defendants and other home builders, meaning that he was not on the permanent payroll of any home building company.[70]  Alabama Heritage also paid Mr. Haynie to take several hand-drawn floor plans and re-draw them with CADD software, so that the electronic designs could be more easily used and modified by Alabama Heritage to suit the needs of individual customers.[71]  Mr.

---

[66] Benton Deposition, at 80-88.

[67] Defendants' evidentiary submission, Exhibits 9 and 10.

[68] Defendants' evidentiary submission, Exhibit 11 (Deposition of Lavor Haynie), at 149.

[69] *Id.* at 55-56.

[70] *Id.* at 63-64.

[71] *Id.* at 91-92, 130-33.

Haynie testified that, at the time he created the Dorothy plan, he had never seen plaintiff's 2715 and 2820 plans.[72]   He did, however, attend home building trade shows, and he received the Parade of Homes publication that was inserted in the local newspaper while he was working in the Huntsville-Madison County area.[73]   Alabama Heritage registered a copyright in the Dorothy plan in September of 2010.[74]

### 5.    Comparing the plans

Renderings of the 2715, 2820, and Dorothy house plans are set out in Appendix A to this opinion.

As discussed in part I(C)(1) of this opinion, *supra*, Jeremy Erdreich has testified that the 2715 and Dorothy home plans share many design elements based solely on market-driven functionality, including:

1.    Small formal Living and Dining rooms flanking a small front Foyer;

2.    A larger, open, informal Family and Kitchen area facing the rear;

3.    Provision of all, or almost all, Living area on main level;

4.    Separation of Master Suite from secondary bedrooms;

5.    Minimum 2-car Garage;

6.    Four total Bedrooms and three total Bathrooms;

---

[72] *Id.* at 167-68, 218.

[73] *Id.* at 72-73.

[74] Alabama Heritage Deposition, at 163-64.

-31-

7.     Laundry or Mud Room convenient to Garage;

8.     Pre-fabricated fireplace;

9.     Either one larger or two somewhat smaller Master walk-in closets;

10.     Double vanity, garden tub, separate shower, separate water closet in Master Bath; [and, an]

11.     All-brick exterior.[75]

The 2715 and Dorothy plans also share the following functional elements that are driven by industry standards:

1.     Absence of a basement or crawl space;

2.     Absence of finished attic space;

3.     Relatively square plan to reduce material and labor costs

4.     Relatively few French doors, in favor of more economical fixed or sash windows;

5.     Room dimensions that require standard, economical lumber spans and stud heights;

6.     Simple, centralized roof geometry; and

7.     Consistent, standard window sizes and head heights.[76]

As Erdreich explained in his expert report, "functional" elements in home design, like the ones listed above, are the product of external forces, like the

---

[75] Erdreich Deposition, at 157-63; Erdreich Report, at 2.

[76] Erdreich Report, at 3.

marketplace or industry standards, and not the individual preferences of the designer.[77]

In contrast, according to Erdreich, "creative" elements are not subject to the same external forces as functional elements and, therefore, can be influenced by the subjective preferences of the designer.[78] Erdreich also testified that, even though the 2715 and 2820 plans share many common functional features with the Dorothy plan, the "individual arrangement and spatial character" of those elements "are markedly different due to the nonfunctional [or 'creative'] design choices" made by each plan's designer.[79] Erdreich explained that concept in slightly more detail during his deposition, saying that:

> you can come up with the list of functional elements, *i.e.*, separate shower, two lavatories, you know, a certain large number of square footage for walk-in closet space, all of those are similar. But then the individual arrangement and spatial character, meaning how those designs, each [designer] has taken those elements and arranged them differently, are examples of the creativity part of my argument, taking those elements and choosing to arrange them one way or the other way.[80]

Erdreich stated in his report that some of the "creative" differences between the 2715 and 2820 plans, on the one hand, and the Dorothy plan, on the other, include:

---

[77] *Id.* at 2.

[78] *Id.*

[79] *Id.* at 3 (alteration supplied).

[80] Erdreich Deposition, at 110-11 (alteration supplied).

1.      Bathroom layouts (as long as the functional elements above are included);

2.      Closet configurations and locations;

3.      Kitchen arrangements and orientations;

4.      Laundry Room arrangements;

5.      Front Door design;

6.      Window configurations, placement and grid layouts;

7.      Window shutters;

8.      Minor decorative details such as brick coursing and headers, small stone accents, etc.[81]

Erdreich testified during his deposition that other creative differences included: (1) the design of the interior entry door to the dining room; (2) raised or "trayed" ceiling in the dining room and master bedroom in the Dorothy; (3) more design detail in the transition from the foyer to the hallway in the Dorothy; (4) placement and design of windows; (5) the entrance to the master suite is at a 45-degree angle in the 2715/2820, but not in the Dorothy; (6) one large walk-in closet in the master suite of the 2715/2820, but a divided closet in the Dorothy; (7) individual sinks flanking a garden tub set at a 45-degree angle in the 2715/2820 master bath, but adjacent sinks adjacent to a garden tub not set on an angle in the Dorothy master bath; (8) closet

---

[81] Erdreich Report, at 3.

placed between the master bedroom and master bath in the 2715/2820, but master bath placed between the master bedroom and closet in the Dorothy; (9) shower on the same wall as the garden tub in the 2715/2820 master bath, but across from the garden tub in the Dorothy master bath; (10) walk-in pantry in the Dorothy kitchen, but not in the 2715/2820; (11) 45-degree entries into two of the bedrooms in the Dorothy, but not in the 2715/2820; (12) partial wall separating the den and the breakfast area in the 2715/2820, but not in the Dorothy; (13) direct entry into the master suite from the den in the 2715/2820, but entry to the master suite through a hallway in the Dorothy.[82]

Julie Brakefield testified to some of those same differences during her deposition. She also testified that the wall of the garage "jogs in," or is deeper along one part of a wall than the rest, in the Dorothy plan, but not in the 2715 or 2820.[83] However, Brakefield also testified to what she believed was an important similarity between the 2715/2820 and Dorothy plans: "There is one area of the foyer [that] is seven feet wide, it goes the length of the dining room and the study, and then it jogs in to five feet [and] that is a distinct job, no one else is going to come up with that."[84] Brakefield believed that, given the way the foyer and "jog-in" were laid out, it would be impossible for another designer to have created that design independently, without

---

[82] Erdreich Deposition, at 193-203.

[83] Brakefield Deposition, at 203-12.

[84] Brakefield Deposition, at 136 (alterations supplied).

first looking at her 2715/2820 designs.[85]

Other differences were not testified to by any witness, but are apparent upon viewing the three plans:  *e.g.,* (1) the Dorothy has a 3-car garage, while the 2715 and 2820 have a 2-car garage; (2) one wall of cabinetry is on a 45-degree angle in the 2715/2820 kitchen, but not in the Dorothy; (3) the kitchen pantries are in different locations; (4) the guest bathroom is directly accessible from the second bedroom in the Dorothy, but is accessible only from the hallway in the 2715/2820; and (5) there is a window from the fourth bedroom to the covered terrace in the 2715/2820, but not in the Dorothy.[86]

According to Erdreich, and generally speaking, the smaller the house, the less room there is for variation and creative design choice.  Thus, house plans within the market segment that includes the 2715, 2820, and Dorothy plans — *i.e.,* production homes of approximately 3,000 square feet — have fewer design variations than larger, more expensive, more custom homes.[87]  As Erdreich plainly put it, "[t]here are a limited variety of ways that a roughly 3,000 [square-foot] square plan can be

---

[85] *Id.*

[86] Defendants' exhibit 16 is a list of "Numerous differences between Dorothy and 2715/2820."  Defendants did not identify the author of that exhibit, or provide any information about its origin.  As such, it cannot be considered as evidence.  Even so, the court can make its own observations about the similarities and differences between the house plans at issue.

[87] Erdreich Deposition, at 112.

divided once functional demands of market and economy are met."[88]  Because most

or all of the functional demands of the market must still be satisfied within a limited

amount of space, the creative differences that do exist become "elevated," or more

prominent.[89]

## IV. DISCUSSION

Defendants assert three arguments in support of their motion for summary

judgment.  First, they assert that the protectable elements of their Dorothy house plan

are not substantially similar to those of plaintiff's 2715 and 2820 plans.  Next, they

assert that plaintiff's purported copyrights in the 2715 and 2820 plans are invalid or

unenforceable because plaintiff never acquired the ownership rights of some or all of

the authors who contributed to the creation of those plans.  Finally, defendants assert

that plaintiff has waived any copyright interest it might have had in the 2715 and

2820 plans by publishing copies of those plans without notice of copyright protection.

The court finds merit in defendants' first argument and, therefore, does not believe

it is necessary to address their second and third grounds for summary judgment.

> To establish copyright infringement, "two elements must be
> proven: (1) ownership of a valid copyright, and (2) copying of
> constituent elements of the work that are original." *Feist Publ'ns, Inc.*
> *v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361, 111 S. Ct. 1282, 1296, 113

---

[88] Erdreich Report, at 4 (alteration supplied); *see also* Erdreich Deposition, at 116.

[89] Erdreich Deposition, at 116-17.

L. Ed. 2d 358 (1991).  "If the plaintiff does not have direct proof of copying, the plaintiff may show copying by demonstrating that the defendants had access to the copyrighted work and that the works are 'substantially similar.'" *Herzog*[ *v. Castle Rock Entertainment*], 193 F.3d [1241,] 1248[ (11th Cir. 1999)].

*Oravec v. Sunny Isles Luxury Ventures, L.C.*, 527 F.3d 1218, 1223 (11th Cir. 2008).

Here, plaintiff has not offered direct proof of copying, and it appears to be undisputed that defendants had access to plaintiff's 2715 and 2820 house plans through their own research and through plaintiff's advertising efforts.  Thus, the only remaining issue is whether the Dorothy house plan is substantially similar to plaintiff's 2715 and 2820 plans.

The Eleventh Circuit recently confirmed that the issue of substantial similarity is appropriate for resolution at the summary judgment stage.

Though disposing of a case at the summary judgment stage is inappropriate in certain kinds of copyright infringement cases, we have approved of such treatment where the "crucial issue" is substantial similarity.  *Intervest Constr., Inc. v. Canterbury Estate Homes, Inc.*, 554 F.3d 914, 920 (11th Cir. 2008).  This is because "the ability to separate protectable expression from non-protectable expression is, in reality, a question of law or, at the very least, a mixed question of law and fact."  *Id*.

*Miller's Ale House, Inc. v. Boynton Carolina Ale House, LLC,* 702 F.3d 1312, 1325 (11th Cir. 2012).  The pertinent inquiry on summary judgment is "'whether a reasonable jury could find the competing designs substantially similar at the level of

-38-

protected expression.'" *Id.* (quoting *Oravec*, 527 F.3d at 1224 n.5 (in turn citing *Beal v. Paramount Pictures Corp.,* 20 F.3d 454, 459 n.4 (11th Cir. 1994))).

> In identifying the protected elements of a plaintiff's architectural work, we begin by examining the statutory definition:
>
> > An "architectural work" is the design of a building as embodied in any tangible medium of expression, including a building, architectural plans, or drawings. The work includes the overall form as well as the arrangement and composition of spaces and elements in the design, but does not include individual standard features.
>
> 17 U.S.C. § 101. Though "individual standard features" are not protectable (a "grant of exclusive rights in such features . . . imped[ing], rather than promot[ing], the progress of architectural innovation," H.R. Rep. No. 101–735, at 18), "the *arrangement and coordination*" of such features may be. *Intervest*, 554 F.3d at 919 (emphasis in original). *See also Oravec*, 527 F.3d at 1225. This reflects Congress's recognition that "creativity in architecture frequently takes the form of a selection, coordination, or arrangement of unprotectible [*sic*] elements into an original, protectible [*sic*] whole." H.R. Rep. No. 101–735, at 18 (quoted in *Intervest*, 554 F.3d at 919).

*Miller's Ale House*, 702 F.3d at 1325-26 (footnotes omitted) (alterations in original).

Moreover, the Eleventh Circuit has recognized that "copyright protection for an architectural work is 'thin;'" consequently, "[s]ubstantial similarity exists only 'where an average lay observer would recognize the alleged copy as having been appropriated from the [protectable features of the] copyrighted work.'" *Id.* at 1326 (quoting *Intervest*, 554 F.3d at 919 n.3; *Oravec*, 527 F.3d at 1224) (other citations

omitted) (first alteration supplied, second alteration in original).  Because of the "thin" copyright protection for architectural works, "'modest dissimilarities are more significant than they may be in other types of art works.'" *Miller's Ale House*, 702 F.3d at 1326 (quoting *Howard*, 974 F.2d at 1276).  Further, "[b]ecause there are only a limited number of ways to turn a rectangular building into [an interior floor plan], 'similarities in the general layout of rooms can easily occur innocently.'" *Id.* (citing *Howard*, 974 F.2d at 1276).  Thus, any differences between two floor plans "would weigh heavily against a finding of substantial similarity." *Id.* (quoting *Oravec*, 527 F.3d at 1227).[90]

The Eleventh Circuit's decision in *Intervest Construction, Inc. v. Canterbury Estate Homes, Inc.,* 554 F.3d 914 (11th Cir. 2008), is particularly instructive because it also addressed the issue of whether two residential home plans used by two competing builders (*i.e.,* the "Kensington" and the "Canterbury") were substantially similar.  The Eleventh Circuit described the similarities between the two plans as follows:

Each floor-plan depicts a four-bedroom house, with one bedroom being

---

[90] It should be noted that the *Miller's Ale House* opinion concerned a claim of copyright infringement based on the floor plans of two bars, not residential house plans.  That distinction is immaterial, however.  The Eleventh Circuit in *Miller's Ale House* did not confine its analysis to the bar setting; to the contrary, it discussed architectural works in general.  Moreover, the *Miller's Ale House* opinion relied heavily upon the Eleventh Circuit's previous decision in *Intervest*, which concerned residential house plans.

denominated as a "master" bedroom or suite.  Each floor-plan includes
a:  two-car garage; living room; dining room; "family" room; foyer;
"master" bathroom; kitchen; second bathroom; nook; and porch/patio.
Each floor-plan also reflects certain "elements" common to most houses:
doors; windows; walls; bathroom fixtures (toilet, tub, shower, and sink);
kitchen fixtures (sink, counter, refrigerator, stovetop, and
pantry/cabinets); utility rooms and fixtures (washer, dryer, and sink);
and closets.  A cursory examination of the two floor-plans reveals that
the square footage of both is approximately the same.  Also, as is
common to houses, there are placements of entrances, exits, hallways,
openings, and utilities (furnace, air conditioner, hot water heater, and
telephone hardware).

*Interest*, 554 F.3d at 916.  Even so, there were numerous "dissimilarities" in "the

selection, coordination, and arrangement of these common components and

elements." *Id.*  For example, the square footage of the rooms in the two designs was

different; the garage entrance was in the front in the Westminster and on the side in

the Kensington; the Kensington had attic access above the garage, but the

Westminster had a "bonus room"; the air conditioning unit and water heater were

placed differently; the number of windows in the two garages were different; and, the

Westminster had a bedroom closet to the left of the utility room, whereas the

Kensington had a hallway.  *Id.* at 916-17.  The three secondary bedrooms that were

located together on one side of each house plan had differently shaped and situated

closets, different wall configurations, different entries, different door designs, and

different overall shapes in the two plans.  *Id.* at 917.  The hallway bathrooms in the

two designs had different sizes, alignments, bathtub configurations, and sink shapes. *Id.* The breakfast nooks in the two plans were configured differently, built with different materials, had different windows, and had different means of entry from the adjacent room. *Id.* at 918. With regard to the kitchens in the two plans, the wall placement, pantry location, pantry door configuration, counter size, and dishwasher location all were different, and one plan had an island that was lacking in the other. *Id.* The front entrance doors, doors from the master bedroom to the patio, and doors from the master bath to the walk-in closet also were different in the two plans, as was the placement of the sinks in the master bath. *Id.* "Given the number of dissimilarities in the respective coordination and arrangement of these non-original, commonplace elements and components, the district court ruled that no reasonable observer could conclude that the copyrightable elements of the two floor-plans were substantially similar." *Id.* The Eleventh Circuit upheld that decision on appeal. *Id.* at 921.

The present case is similar. There are undeniable similarities between plaintiff's 2715 and 2820 plans and defendants' Dorothy plan. As discussed above, all three plans share the same basic configuration of entrance foyer, living room, dining room, family room, and kitchen. All have four bedrooms and three baths, with the master suite separate from the other bedrooms. All three are one-story, with a

minimum 2-car garage, nearby laundry room, pre-fabricated fireplace, and all-brick exterior. The master bath in all three plans contains a double vanity, garden tub, separate shower, and separate water closet, and each master suite contains either one larger or two smaller walk-in closets. Each plan is basically square in shape, with no basement, crawl space, or finished attic space. The room and window dimensions in each plan are designed to require only standard building materials, and all plans minimize the use of French doors. Finally, the roof geometry in each plan is simple and centralized. As defendants' expert testified, all of these so-called "functional" elements are basic and necessary, due to either industry standards or customer-driven market demands. They are the so-called "individual standard features" that the *Miller's Ale House* decision said were not protected. *Miller's Ale House,* 702 F.3d at 1326.

Indeed, plaintiff acknowledges that these individual elements are not protected by copyright.

> Plaintiff does not claim copyright ownership of the individual standard features included in the [2715 and 2820 plans], but only of the unique selection, arrangement and coordination of those features as well as the new, protectible design elements incorporated into those features that were clearly appropriated by Defendants and implemented into the Dorothy.[91]

Plaintiff also asserts that the "overall form of the Dorothy" is substantially similar to

---

[91] Doc. no. 49 (plaintiff's summary judgment response brief), at 19 (alteration supplied).

its 2715 and 2820 plans and, therefore, is protected by copyright.  The court does not agree.  As with the individual design elements themselves, the selection, arrangement, and coordination of those elements in plaintiff's 2715 and 2820 plans is not particularly unusual.  Certainly, they are not unique.  As defendants' expert testified, there are only so many ways those individual elements can be arranged in a cost-effective square design of approximately 3,000 square feet.  That expert testimony was consistent with the Eleventh Circuit's previous recognition that "there are only a limited number of ways to turn a rectangular building into [an interior floor plan] . . . ."  *Miller's Ale House*, 702 F.3d at 1326 (citing *Howard*, 974 F.2d at 1276).  It would be unduly restrictive — and would cut against the policy favoring the free flow of ideas and information — to grant plaintiff a monopoly on the design of a roughly 3,000 square-foot home plan using a square box design; open floor plan; three bedrooms separated from a master bedroom by a kitchen, great room, and breakfast area; formal living room and dining room flanking a front entry foyer; laundry room; garage; and terrace, even if all of those elements are arranged in the same general configuration.  *See Oravec,* 527 F.3d at 1225 (noting that the Copyright Act "seeks to achieve a proper balance between competing societal interests: that of encouraging the creation of original works on the one hand, and that of promoting the free flow of ideas and information on the other").  Those elements, and even the general

arrangement of them in the 2715 and 2820 house plans, are simply too common to warrant copyright protection.

This conclusion is amplified by the overwhelming number of differences between plaintiff's 2715/2820 plans and defendants' Dorothy plan. *See Miller's Ale House,* 702 F.3d at 1326 (stating that, due to the "thin" copyright protection afforded architectural works, any differences between two floor plans "would weigh heavily against a finding of substantial similarity"). Those differences are set out in more detail above, but they include significant differences in the layout of the master suite, different interior door and ceiling designs, differences in window placement, presence of a walk-in pantry in only the Dorothy, absence of a hallway leading to the master suite in the 2715 and 2820, absence of a partial wall separating the den and breakfast area in the Dorothy, differences in interior wall angles, and different entry points to the guest bathroom. Taken as a whole, these differences are of the same scale as the differences between the Kensington and Westminster plans discussed in the Eleventh Circuit's *Intervest* decision. Like the court in *Intervest,* this court must hold that the number of differences in the coordination and arrangement of common elements between plaintiff's 2715 and 2820 plans and defendants' Dorothy plan are so great that no reasonable jury could conclude that the protectable elements of plaintiff's and defendants' plans are substantially similar. Because the plans are not substantially

similar as a matter of law, plaintiff cannot succeed on its copyright infringement claim, and summary judgment is due to be granted on that claim.[92]

## III. CONCLUSION AND ORDERS

In accordance with the foregoing, plaintiff's motion to exclude the testimony of defendants' expert witnesses is GRANTED in part and DENIED in part. The motion is GRANTED only to the extent that the court did not consider the testimony from defendants' proposed expert Jeremy Erdreich as to the ultimate issue of substantial similarity. The motion is DENIED with respect to the remainder of Erdreich's testimony on the subjects of functionality of design elements, lack of design variation, and substantial similarity. Further, as defendants did not rely upon any of the testimony of Denise T. Dauphin, or on Erdreich's testimony about the apportionment of value, in support of their motion for summary judgment, the motion to exclude is DENIED as moot with regard to that opinion testimony.

Defendants' motion for summary judgment is GRANTED, and it is ORDERED that all of plaintiff's claims are DISMISSED with prejudice. Costs are taxed to plaintiff. The Clerk is directed to close this file.

**DONE** and **ORDERED** this 11th day of March, 2013.

---

[92] Because summary judgment is due to be granted due to lack of substantial similarity, the court need not address defendants' other arguments in favor of summary judgment, *i.e.,* that plaintiff's copyright registration is invalid, and that plaintiff has waived its ability to assert a copyright violation.

_____
United States District Judge